IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ALBERT WATSON, | } |
|     Plaintiff, | } |
| | }    CIVIL ACTION NO. |
| v. | }    02-AR-2284-S |
| ENERGY DISPATCH, LLC, | } |
|     Defendant. | } |

**<u>MEMORANDUM OPINION</u>**

Defendant, Energy Dispatch, LLC, invoking Rules 50 and 59, F.R.Civ.P., has filed a timely post-trial motion challenging both the legality of the final judgment entered on the jury verdict in favor of plaintiff, Albert Watson ("Watson"), and, in the alternative, challenging its amount.

As to the amount of the judgment, which was an aggregation of three separate elements of damages assessed by the jury, the court finds that the amounts awarded were justified by the evidence and within the realm of reasonbleness. The only real question, then, is whether or not the evidence justified giving the case to the jury in the first place.

In support of its insistence that the jury findings of a racially motivated termination and retaliation were against the great weight of the evidence, Energy Dispatch argues:

> In his direct examination, Plaintiff testified that Mr. Seabock had come to Birmingham one week earlier for the purpose of introducing himself to the Birmingham drivers. Plaintiff testified that during the course of this meeting Mr. Seabock had made comments to Mr. Watson and

>a white driver, Terry Finley, that Mr. Seabock would be taking stations away from the drivers and redistributing them.  When the drivers became upset about this new arrangement, Plaintiff testified that Mr. Seabock said he was just kidding, and that **"we can do that with our coonies."**  Plaintiff also testified that George Manning was present at the meeting and brought the remark to Plaintiff's attention.  Plaintiff further identified Ricky St. John and Richard Blackburn as other drivers in attendance at the meeting who witnessed Mr. Seabock's comment.
>
>                    * * * * * * * * *
>
>On Tuesday, April 2004, Defendant continued its cross-examination of Plaintiff and established that **Plaintiff never made reference of the alleged "coon" comment to the EEOC during the four (4) years in which it had jurisdiction over the investigation of his complaint.  In fact, the evidence showed that this alleged "coon" comment did not surface until Plaintiff retained the services of an attorney and filed suit.**

(emphasis supplied).

Memorandum of Energy Dispatch in support of its motion, at p. 3.

Although there is no proof that Watson voiced a precise complaint about Seabock's use of the precise word **"coonies"** until after the EEOC had taken four years to reach the conclusion that Watson was a victim of racially disparate treatment by Energy Dispatch, there is more than ample evidence that Watson very early during the EEOC investigation complained of speech by Seabock that was racially derogatory and consistent with a use of the offensive term "coonies".  Energy Dispatch itself offered into evidence the EEOC memorandum that memorialized its interview with Watson on January 19, 1999, shortly after the events Watson complains of.

That memorandum says:

> CP [Watson] stated that Seabock began **harassing** him (**picking on him**) at the first meeting Seabock had with the drivers after becoming the regional manager on/about 09/05/98. CP said that Seabock threatened to take some of his stations and **made other disparaging comments**. CP said that Seabock's **verbal assaults were so noticeable that Ricky Blackburn (WM driver) asked Seabock "Why you standing there picking on Albert? All Albert is going to do is call Atlanta and tell them what you're doing."** CP said a few days later he called Gambino and told Gambino that Seabock was **picking** at him; threatening to take his stations. CP said that he told Gambino that Seabock was not listening to him; Seabock was only listening to the White drivers. CP said he was the only Black driver present and **he took Seabock's picking at him to be because of his race**.

(emphasis supplied).

Defendant's Exhibit 21.

If Seabock did say "we can do that with our coonies", or something like it, to justify the threat to take away high commission paying filling stations from a black driver, it could only be described as a "disparaging comment". Nothing would be more "racially harassing" or "disparaging" than to say in a racially mixed group, that "coonies" can, with impunity, be singled out for disparate treatment. No verbal expression that could be characterized as a "disparaging comment" except this one was ever voiced by a witness. And, there is ample evidence that Watson shortly complained of Seabock's expression of racial bias to a manager above Seabock in the Energy Dispatch hierarchy, just as a fellow driver predicted.

    The relative credibility of Watson and the employees of Energy

3

Dispatch was a matter for the jury.  Although Watson's testimony may have been less than perfectly consistent, neither was the testimony of Seabock consistent with that of other Energy Dispatch witnesses or with himself.  For instance, Seabock's testimony that he always conferred with a supervisor before terminating or severely disciplining an employee is hard to reconcile with his testimony that the decision to terminate Watson was solely his decision.  There is ample evidence upon which the jury could have found that Seabock talked to one or more of his superiors, including Gambino, after Watson complained to Gambino about Seabock and before the termination decision was made.  In other words, there was evidence either that Seabock knew about Watson's protected complaint about him shortly before he terminated Watson, or Gambino knew about Watson's complaint when he and Seabock together made the decision to terminate Watson.  There is more in this case than mere close temporal proximity to suggest a retaliatory motive.

There is another exacerbating piece of evidence lending credence to Watson's contention that Energy Dispatch's "articulated reasons" for its decision are mere pretext.  Somewhere in Seabock's deposition he referred to Watson's failure to take a drug test as a reason, if not the most important reason, for terminating Watson.  By the time Watson was told of his termination, he had taken the drug test.  At trial, Seabock had to be reminded of this deposition

4

testimony which was inconsistent with the reasons he and Energy Dispatch gave to the EEOC for the firing. Energy Dispatch's confusion about its reason or reasons diminished its credibility and provided an arguable inference of pretext.

Although the wisdom of Energy Dispatch's decision to fire Watson is not a matter for resolution in a Title VII case, the haste with which the termination decision was made after Watson's accident, with the paucity of investigation, but with the clear knowledge that Watson was not at fault and had reported the accident immediately, enhances the appearance of a causal connection between Watson's complaint about Seabock and Seabock's adverse reaction or participation in the decision to fire Watson. This provided a basis for the award of punitive damages.

The court believes that it was correct in denying Energy Dispatch's Rule 50 motions before it entered judgment on the verdict, and finds no reason to reconsider or to grant the renewed Rule 50 motion or the Rule 59 motion for an alteration of the judgement or for a new trial.

An appropriate separate order will be entered.

DONE this 31st of May, 2005.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE